Chief Judge Desmond.
Plaintiff Incres Steamship Company, Ltd., is a Liberian corporation owned by Italian stockholders. During seven months of each year it operates two Liberian-registered passenger ships, manned by alien crews signed on in Europe, on regularly scheduled cruises to Caribbean ports, originating at and returning to New York City. Its main office is in London and it has no place of business in Liberia but it has in New York City an office which it shares with a New York corporation (Incres Line Agency, Inc.) owned and controlled by Incres. The New York office is run by its manager who is president of Incres and the New York corporation acts as agent for Incres in booking passengers for the cruises, arranging schedules, and providing supplies, repairs and the like.
Defendant International Maritime Workers Union (IMWU) is an American labor union formed in 1959 by two other American maritime unions, both affiliated with AFL-CIO, to organize and improve job conditions of merchant seamen employed on “ flag-of-convenience ” ships, that is, ships registered in foreign countries (principally in Liberia, Panama and Honduras) but *222 whose beneficial owners are not otherwise connected with the nations whose flags they use. As the United States Supreme Court observed in Lauritzen v. Larsen (345 U. S. 571, 587) : “It is common knowledge that in recent years a practice has grown, especially among American shipowners, to avoid stringent shipping laws by seeking foreign registration eagerly offered by some countries.” American seamen’s wages are several times as high as those paid by Incres. Beginning in February, 1960 representatives of IMWU began a campaign to organize plaintiff’s seamen, going aboard the two vessels when docked in New York City and talking to the crew members. There were fruitless negotiations between Incres and the union. On May 13, 1960 the Incres cruise ship Nassau arriving at New York was met by IMWU representatives who, picketing peacefully, carried signs charging unfairness of Incres in refusing recognition to the union and demanding better wages and working conditions for the seamen. Later that day the IMWU pickets persuaded about 100 members of the Nassau’s crew to leave the ship shortly before her scheduled departure and refuse to obey her captain’s orders to return, resulting in a cancellation of the sailing. Two days later when the other Incres cruise ship Victoria came into New York harbor she could not dock because the strike-bound Nassau occupied the berth. The Victoria lay at anchor. While her passengers were being brought ashore on tugs, IMWU representatives arrived in a launch, boarded the tugs and at least for a time persuaded the tug crews to stop disembarking the Victoria’s passengers. As a result of the picketing and striking, several cruises were cancelled. The union filed with the National Labor Relations Board (NLRB) charges of unfair labor practices which are still pending. Incres began this action in Supreme Court, New York County, and obtained first a temporary, then after trial a permanent, injunction enjoining the union from picketing plaintiff’s vessels or urging or encouraging crew members not to work on the vessels.
From the beginning the respective parties have taken the same two opposing positions as to which the Appellate Division divided 3 to 2 and which are again urged on us on this appeal. Incres argues, and both courts below held, that defendant’s acts were illegal and tortious, and that the New York Supreme *223 Court, not the National Labor Relations Board, had jurisdiction and power to restrain them. The union — and the two dissenting Justices at the Appellate Division — insist that the NLRB has under San Diego Unions v. Garmon (359 U. S. 236; see Dooley v. Anton, 8 N Y 2d 91) exclusive primary jurisdiction since the conduct complained of is at least ‘ ‘ arguably ’ ’ or “ potentially ” subject to Federal regulation as protected activity or prohibited unfair labor practice under the Labor Management Relations Act (U. S. Code, tit. 29, § 141 et seq.). The only real question for us is whether the NLRB or the New York courts have jurisdiction of this controversy or, putting it more accurately, whether there is such doubt as to the applicability of the Federal statute that under the San Diego Unions v. Garmon ‘ ‘ arguably subject ” rule (359 U. S. 236, 245, supra) the State courts must yield to ‘‘ the exclusive primary competence ” of the NLRB.
The union, besides asserting the exclusive jurisdiction of the NLRB, argues that its conduct was not unlawful, that the New York courts have no power to enjoin a “maritime tort” and that, in any event, injunctive relief from a New York court is precluded by the “labor dispute” provisions of section 876-a of the Civil Practice Act. We will assume, as did the Appellate Division, that the union is wrong as to all those positions, and go to the real question — jurisdiction. (This court has jurisdiction of the appeal because the Appellate Division made a slight modification of the permanent injunction by changing the language which prohibited picketing the vessels ‘ ‘ for any purpose” so as to read for “any such purpose”—that is, a limitation to the particular activity condemned.)
The whole issue may be stated thus: is this dispute 1 ‘ arguably subject ” to NLRB jurisdiction or, on the contrary, has it been authoritatively determined that the Labor Management Relations Act is completely inapplicable to labor disputes between nationals of other countries operating ships under foreign flags Í The Supreme Court has not definitively made answer to that, but recent judicial and NLRB history, some of it made since the Appellate Division decision here, leaves it disputable that the NLRB has primary jurisdiction. The NLRB has taken jurisdiction of several representation cases as to foreign flag vessels (Peninsular & Occidental S. S. Co., 42 LRRM 1113 *224 [1958]; Eastern Shipping Corp., 44 LRRM 1571 [1959], and West India Fruit & S. S. Co., 47 LRRM 1269 [1961]) and in Navios Corp. v. National Mar. Union (402 Pa. 325 [1960]) the United States Supreme Court (366 U. S. 905 [1961]) denied certiorari as to a Pennsylvania Supreme Court decision which had upheld dismissal of a State court suit on the ground of exclusive NLRB jurisdiction. Both the NLRB holding in the West India case and the denial of certiorari in Navios came after the Appellate Division’s determination of the present case. In retaining jurisdiction in West India Fruit & S. S. Co., the National Labor Relations Board wrote most comprehensively, reviewing practically every aspect of this question. We shall discuss that holding later on in this opinion but we say now that it clearly refutes the allegation in paragraph 17 of the complaint in the present action that the Federal labor relations statute does not “ apply to foreign ships with foreign crews in any way
lucres cites Benz v. Compania Naviera Hidalgo (353 U. S. 138) and Marine Cooks v. Panama S. S. Co. (362 U. S. 365) as final authority that the Federal act has no coverage of internal labor relations between a foreign ship and its foreign workers. The union answers correctly that the Bens case as explained in the Marine GooJcs Union opinion related only to a ship which “ happened temporarily to be in American waters ” (see 362 U. S., p. 369). Bens marked the point of division in the Appellate Division. However, the emphasis in Bens on the transient character of the American contacts of the ship there involved makes it impossible to regard the Bens holding, as the Appellate Division majority did, as a determination that “ Congress did not intend to apply the Federal statute at all to foreign shipping.” Left open by the Bens case was the question of what shipping is so “ foreign ” as to be excluded. All agree that foreign registration is not enough (see Afran Transp. Co. v. National Mar. Union, 169 F. Supp. 416, cited by the Supreme Court in the Marine Coolcs Union opinion, 362 U. S. 365, 371, supra). All agree that Congress has power to intrude on the internal economy of a foreign-registered ship as a condition to permitting entry into American ports or waters (see Benz v. Compania Naviera Hidalgo, 353 U. S. 138, 144-145, 147, supra). The unresolved question is as to whether Congress intended it» *225 statute to apply to labor relations on a ship which while foreign-registered, foreign-crewed and foreign-owned has an American port as one of the two termini of its fixed, regular shuttle service, conducts an important part of its business from a New York City office and has no office at all in Liberia, the country whose flag its vessels fly. Is it possible to argue that those American “ contacts ” are sufficient for NLRB jurisdiction? The Federal Supreme Court, whatever answer it may finally give as to that, has already told us in the Garner v. Teamsters Union (346 U. S. 485, 490) and San Diego Unions v. Garmon (359 U. S. 236, 244, supra) cases that the State courts are “ not primary tribunals to adjudicate such issues ”, that these determinations must “ be left in the first instance to the National Labor Relations Board ” and, where conduct complained of is “ arguably ” or “potentially” subject to regulation and the Federal act, “ States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board ” to avert “ state interference with national policy ”. Under the board’s West India Fruit & S. S. Co. decision (47 LRRM 1269, supra) it is, we think, certainly uncertain whether the board could validly or would take jurisdiction of this controversy. Indeed, a complaint by the union against alleged unfair labor practices by Ineres has been pending before the board for a year without any decision as to jurisdiction or merits.
The ship in the West India Fruit & S. S. Co. case (47 LRRM 1269, supra) was the freighter Sea Level flying the Liberian flag and owned by a Liberian corporation but operating as a common carrier between Louisiana and Cuba, and with a Cuban crew. Clearly, held the board, she was engaged in ‘1 commerce ’ ’ under the Federal act, the alleged unfair labor practices ‘ ‘ affected ’ ’ commerce under the act and nothing in the act exempts the maritime industry or seafarers. The “ ship-territory ” doctrine, said the board, has nothing to do with the territorial reach of the statute (Cunard S. S. Co. v. Mellon, 262 U. S. 100, 123) and so there is no “extraterritoriality” to interfere with applying the Federal statute to a foreign ship in American waters. The board concluded that there was nothing to prevent Congress applying this law to events occurring on foreign-registered ships in domestic waters.
*226 The question, said the board, was whether Congress, empowered as it is to regulate such ships while engaged in our foreign commerce, has by this act chosen to do so. The answer, it said, cannot be all inclusive but must under Supreme Court rulings be found by ascertaining and valuing the contacts between the transactions and the governments whose laws are in competition and by weighing the significance of one or more of those contacts (see Lauritzen v. Larsen. 345 U. S. 571, 578, supra, and Benz v. Companía Naviera Hidalgo, 353 U. S. 138, supra). To warrant application of American law, held the board, not all significant contacts need be American. Neither the “flag law” nor American ownership nor the nonresident status of the crew nor the 1 ‘ internal order doctrine ’ ’ nor any applicable treaty is necessarily decisive, one way or the other. The board noted that the controversy was between an American union and an American employer, since the owner corporation and its stockholders were American. But the result reached by the board did not necessarily turn on those latter circumstances. The American contacts, held the board, were that the “ dispute arose aboard a vessel which engaged exclusively in American foreign commerce, which operates regularly out of an American port, and which is drydocked and regularly provisioned in the United States.” The foreign contacts, it said, were “the registry of the vessel and the nationality of the crew Avhich works under foreign articles signed, however, in the United States.” The Benz case (supra), so the board thought, meant no more than that ‘ ‘ the Labor Act does not extend to a foreign flag vessel, its foreign owner and foreign crew absent substantial American commerce ’ ’. "While the board’s decision mentions the American nationality of the stockholders of the foreign corporation operating the Sea Level, no particular point is made of that ‘ ‘ contact ’ ’ and there is no indication that the result would have been different had the stockholders been nationals of other countries. If the board had meant that domestic incorporation or domestic stock ownership was the essential thing, it could have said so. In Eastern Shipping Corp. (44LRRM 1571 [1959], supra) beneficial ownership of the foreign corporation Avas shown to be 95% foreign, but the board in a nonfinal decision overruled its Regional Director who had dismissed a representation proceeding because it involved labor relations on a “ foreign ” ship.
*227 All the other arguments against NLRB jurisdiction as put forth by lucres here, including the “ national policy ” argument, were rejected in the board’s opinion in the West India Fruit & S. S. Co. proceeding (47 LRRM 1269, supra). It is surely “ arguable ” that the board would exercise jurisdiction in the dispute as to which this injunction was ordered. We should, therefore, hold as we did in Dooley v. Anton (8 N Y 2d 91, supra) that at least until the board refuses jurisdiction the State courts have none.
The judgment should be reversed and the complaint dismissed, with costs to defendants-appellants-respondents in all courts.